# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2020AP32-CR

†Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**OSCAR C. THOMAS,**

**DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | July 30, 2021 |
| Submitted on Briefs: | January 28, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Reilly, P.J., and Davis, J. |
| Concurred: | Neubauer, C.J. |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *John T. Wasielewski* of *Wasielewski & Erickson*, Milwaukee. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sonya Bice*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

July 30, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP32-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2007CF1**

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

OSCAR C. THOMAS,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Kenosha County: BRUCE E. SCHROEDER, Judge. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Davis, J.

¶1 REILLY, P.J. In 2007, Oscar C. Thomas was charged with first-degree intentional homicide, first-degree sexual assault, and false imprisonment in

the death of his wife,[1] Joyce. The autopsy revealed that Joyce died from "[s]trangulation due to physical assault." Thomas was convicted of all three charges by a jury. He appealed, we affirmed, and our supreme court denied review. *State v. Thomas*, No. 2010AP1606-CR, unpublished slip op. ¶1 (WI App Nov. 9, 2011)*, review denied,* 2012 WI 45, 340 Wis. 2d 542, 811 N.W.2d 818. Thomas pursued federal habeas corpus relief, *Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015),[2] and was granted a new trial.

¶2 Thomas was retried in 2018, again convicted of all charges, and sentenced to life imprisonment. Thomas's postconviction motion was denied by the circuit court, and he appeals from his judgment of conviction and from the order denying his postconviction motion. For the reasons that follow, we affirm.

## DISCUSSION

¶3 Thomas makes three main arguments: (1) the "corroboration rule" was violated, as the evidence for first-degree sexual assault consisted entirely of his uncorroborated statement; (2) his Confrontation Clause rights were violated when the court allowed the State to present inadmissible hearsay (testimonial DNA test results) to the jury via its cross-examination of his defense expert; and (3) his right to a fair and impartial jury was violated when the circuit court refused to strike a

---

[1] While Thomas referred to Joyce as his wife during the investigation, the record indicates that Thomas and Joyce were divorced, but were "back together" and cohabitating.

[2] Thomas argued that trial counsel was ineffective for failing to consult or call an expert to "testify consistently with the defense's theory of the case," which was that "Thomas unintentionally caused [Joyce's] death by putting pressure on her neck for too long during sex." *Thomas v. Clements*, 789 F.3d 760, 762-63 (7th Cir. 2015). The court concluded that "a reasonable counsel would have consider[ed] and/or consulted with a forensic expert" and that had trial counsel done so, "there is a reasonable probability the outcome of the trial would have turned out differently." *Id.* at 763. Finding both deficient performance and prejudice, the court reversed the district court's denial of Thomas's habeas petition and remanded the case. *Id.* at 771, 773.

juror that was objectively biased. We address each of Thomas's arguments below along with the facts relevant to that issue.

*Sexual Assault Corroboration*

¶4 Thomas argues that the evidence presented at trial was insufficient to convict him of first-degree sexual assault, as the State failed to satisfy the corroboration rule. The corroboration rule is a common-law standard meant to "ensure[] that a conviction does not stand when there is an absence of any evidence independent of the defendant's confession that the crime in fact occurred." ***State v. Bannister***, 2007 WI 86, ¶¶22-23, 302 Wis. 2d 158, 734 N.W.2d 892. "A conviction will not stand on the basis of a defendant's confession alone." ***Id.***, ¶23. Under the corroboration rule, the State must present evidence corroborating "any significant fact" in the defendant's confession. ***Id.***, ¶27 (citation omitted). In ***Bannister***, our supreme court clarified the standard as follows:

> All the elements of the crime do not have to be proved independently of an accused's confession; however, there must be some corroboration of the confession in order to support a conviction. Such corroboration is required in order to produce a confidence in the truth of the confession. The corroboration, however, can be far less than is necessary to establish the crime independently of the confession. If there is corroboration of any significant fact, that is sufficient under the Wisconsin test.

***Id.***, ¶26 (citation omitted).

¶5 "When a court addresses a defendant's claim that his or her confession was insufficiently corroborated, it examines the sufficiency of evidence presented at trial." ***Id.***, ¶32. As we consider the application of the corroboration rule after a jury's verdict, we review the facts presented at trial in the light most favorable to the verdict. *See* ***State v. Poellinger***, 153 Wis. 2d 493, 506-07, 451 N.W.2d 752 (1990). We review whether the facts fulfill the standard for the corroboration rule

as a question of law. ***Bannister***, 302 Wis. 2d 158, ¶22; ***Peplinski v. Fobe's Roofing, Inc.***, 193 Wis. 2d 6, 18, 531 N.W.2d 597 (1995).

¶6     Thomas gave three formal statements to police during the investigation of Joyce's death.[3]  In the first, Thomas reported to police that he and a friend were smoking crack in the basement that evening and that Joyce had been complaining of chest and ear pain, so he periodically checked on her in their apartment.  As it related to the sexual assault charge, Thomas stated that after midnight, when he went upstairs to check on Joyce, he watched a pornography video and he and Joyce engaged in consensual sex.  Thomas explained that during the encounter, he and Joyce fell out of bed together, but Joyce was not complaining of any injuries, except that her chest continued to hurt.  According to Thomas, he went back to the basement, then left the apartment for a while, and when he returned to check on Joyce he found her on the floor next to the bed, at which point he called 911.

¶7     At the time of Thomas's second statement to police, he was not originally under arrest, but he was placed under arrest during the interview, read his ***Miranda***[4] rights, waived them, and continued speaking to police.  During this interview, Thomas again stated that he was smoking crack in the basement with a friend, but he "kept going upstairs because [he] didn't want Joyce to get suspicious about why [he] was in the basement."  Thomas reported that he left to purchase more crack, came back home and took the drugs as well as some prescribed

---

[3]  Thomas's third statement to police took place while he was in custody.  He filled out an inmate request slip asking to speak to the investigating detective.  During the statement, he implicated a drug dealer named Greg in Joyce's death, indicating that he owed Greg money and that Greg "had to have been the one who went upstairs and strangled" Joyce.  As this statement does not pertain to the sexual assault charge, we will recount it no further.

[4]  ***Miranda v. Arizona***, 384 U.S. 436 (1966).

medication, and then watched the pornography video. Again he indicated that he initiated sex with Joyce and they fell out of bed, but Joyce was not injured. Thomas and Joyce continued to have sex on the floor with "Joyce laying on her stomach" and during that time Thomas stated that he "had [his] left arm … up around her neck." According to Thomas, Joyce went to use the bathroom and he continued to watch the video and smoke crack. When Joyce returned, she commented on Thomas watching the video and laid back down on the bed. Thomas then reported the following incident transpired:

> I then jumped on her hip area and I was humping. I was just messing around when I told her I had time for a quickie. I believe that Joyce was wearing her underpants, and I'm not sure if she was wearing a bra. I rolled Joyce over, and we went back down on the floor. Joyce was laying on her left side, and I was on my left side behind her. I had my left arm was around Joyce's neck. I didn't think I was squeezing hard, but Joyce was struggling and was yelling for me to stop and to quit it. Joyce's feet were kicking the floor while she was telling me to stop. Joyce was telling me she loved me and for me to quit playing. I kept squeezing for a little while until she said she would bite the shit out of me. Joyce's breathing started to slow down, so I turned her loose. After I turned her loose, Joyce was breathing funny and looking at me. I got up and left.

¶8 Thomas indicated that he left the apartment with his friend, and when he returned he found Joyce face down on the floor. He tried to pick her up and put her on the bed, but her face hit the bed, and then she fell and her face hit the floor. Thomas called 911 and did chest compressions until an officer arrived. In his statement to police, he asserted: "I do believe I was accidently responsible for the death of Joyce. I'm not sure if it was by mixing of the crack and medicine that made me so rough with Joyce."

¶9 The Thomases' neighbor, Erika Cruz, also testified regarding her recollections of that evening. She lived in the apartment immediately below the Thomases'. At approximately 2:00 a.m., noises coming from above woke her. She

reported "a lot of noise, people fighting, a lot of noise like screaming," in particular a woman screaming. Cruz testified that she heard the woman say, "Stop, stop, I love you, I love you." Then she heard "something [fall] on the ground—something big, quite big, and then [she] heard silence." According to Cruz, after the silence, she heard moving furniture, a door open, and someone walking out of the apartment. She looked out the window and saw Thomas leaving the apartment.

¶10 During the investigation, the police recovered the pornography video that Thomas said he watched. A sexual assault kit was also conducted on Joyce during the autopsy, but no physical evidence of sexual intercourse was found, including no DNA evidence or injuries to Joyce's genitals.

¶11 Thomas argues that nothing in the evidence apart from his statements corroborate the sexual assault conviction. In particular, he argues that the sexual assault kit revealed no sexual activity, consensual or otherwise. In contrast, the State argues that the video and Cruz's testimony provides sufficient facts to corroborate Thomas's confession.[5]

¶12 We agree with the State that the recovery of the pornography video as well as Cruz's testimony regarding what she heard Joyce yell that morning constitute significant facts under the law. Thomas's confession included two specific facts: (1) he watched a pornography video before "humping" Joyce's hip and (2) when he was "humping" her hip area he had his arm around Joyce's neck and she was "struggling and yelling for [Thomas] to stop" and "telling [him] she loved" him. Both facts were corroborated. The recovery of the video by police corroborated Thomas's statement that he watched the video, and Cruz's testimony

---

[5] The State argues that the sexual assault kit results are irrelevant as the State alleged sexual contact over clothing, not intercourse.

that she heard fighting and a woman say, "Stop, stop, I love you, I love you" corroborates Thomas's recollection of his interactions with Joyce.

¶13 Case law is clear that "[a] significant fact is one that gives confidence that the crime the defendant confessed to actually occur[ed]." *Bannister*, 302 Wis. 2d 158, ¶31. It is not necessary that the significant fact "either independently establish the specific elements of the crime or independently link the defendant to the crime." *Id.* While the video and Cruz's testimony do not establish the elements of the crime of sexual assault, they do corroborate the facts of Thomas's confession and "produce a confidence in the truth of the confession." *Id.*, ¶26 (citation omitted). The standard is "any significant fact" to corroborate that "the crime the defendant *confessed to* actually occur[ed]." *See id.*, ¶¶29, 31 (emphasis added).

¶14 Thomas argues that the law requires some corroboration that sexual contact occurred. The corroboration rule is not so narrowly drawn. The case law illustrates that the significant fact need not independently establish an element of the crime. *See id.*, ¶31. The court properly denied Thomas's sufficiency of the evidence motion.

*Confrontation Clause: DNA Evidence*

¶15 Thomas next argues that his Confrontation Clause rights were violated when the circuit court allowed the State to present inadmissible DNA evidence to the jury during its cross-examination of Thomas's defense expert. The State counters that the DNA evidence was elicited as "impeachment evidence," and even

if the circuit court erred in allowing the evidence, the error was harmless.[6] We conclude that a Confrontation Clause violation occurred but agree with the State that any such error was harmless.

¶16 The State did not introduce any DNA evidence in its case-in-chief to support any of the charges against Thomas. Thomas called only one witness, Dr. Karl Williams, M.D., a medical examiner. Dr. Williams's testimony was pivotal to Thomas's defense, as Dr. Williams testified "that there is insufficient evidence to establish that this is an intentional strangulation" and that Joyce died from "compressive forces to her neck," consistent with Thomas's "version of events." Dr. Williams opined that the cause of Joyce's death was "[c]ompression of the neck in general … probably a, quote, unquote, heart attack in general because the heart stopped."

¶17 On cross-examination, the State questioned Dr. Williams's conclusions regarding how Joyce sustained her injuries, both external and internal. In particular and as applicable to this issue, the State questioned whether the "abrasions" to Joyce's face "could have been caused by the defendant taking his other hand and attempting to cover" Joyce's nose at the time she died, and Dr. Williams responded that it was "[p]ossible." As to the DNA evidence, the following interaction occurred:

---

[6] The State also argues, citing to **State v. Nelson**, 138 Wis. 2d 418, 439, 406 N.W.2d 385 (1987), that Thomas failed to raise an objection in the circuit court based on the constitutional right to confrontation—he only objected based on hearsay—and since he made no constitutional objection, he failed to preserve this argument. Thomas argues that he "clearly objected to admission of the DNA findings in broad terms" and his objection "can fairly be construed to encompass both" hearsay and confrontation. He further notes that "the Court did not allow counsel to complete his objection before interrupting with its ruling." We agree that the record is unclear as to the exact basis of Thomas's claim, and it is also clear that defense counsel's argument was cut short by the court's ruling. In the interest of finality, we will address the merits of Thomas's claim.

> [State:] Now, you also reviewed Wisconsin crime lab reports, correct?
>
> [Dr. Williams:] Correct.
>
> ….
>
> [State:] Okay. But in those crime lab reports, you are aware that there was some analysis done?
>
> [Defense Counsel:] Objection.
>
> [State:] It's what he relied on in his opinion.
>
> [Defense Counsel:] *I'm objecting to going into the details of reports that haven't been introduced into evidence, though. It's a back door—*
>
> [Court:] If he examined it, then it's presumably something he discounted or relied upon. The objection is overruled.

(Emphasis added.) The State questioned Dr. Williams regarding the information contained in the three-page crime lab report. That report apparently[7] stated that Thomas's DNA was found under Joyce's fingernail clippings removed during the autopsy and that Thomas's fingernails also contained Joyce's DNA. Dr. Williams agreed with the contents of the report, but opined that the existence of the DNA was not significant: "They are living in a consensual marriage. A finding of the DNA, they could be scratching each other's back. I mean, there is no evidence of trauma on him to support the fact that she was struggling sufficiently."

¶18     During closing argument, the State presented its theory of how Joyce died, referencing both the scratches on her face and, indirectly, the DNA found under Thomas's fingernails:

> You would have to be high on crack to think that there is any other explanation for Joyce Oliver-Thomas's death than that Oscar Thomas killed her, but it was more than just killing.

---

[7] The crime lab report was not entered into evidence or shown to the jury, and the contents of the report were not further discussed during Dr. Williams's testimony. The crime lab report was also not contained in the record on appeal.

> It was brutal, vicious, violent, choking the life out of her for minutes while she struggled, while she pled for her life, "Stop, stop, I love you, I love you"—while she bit her own tongue and swallowed two to three ounces of her own blood while she is dying, while he is scratching up her face with his free hand, with his right hand, trying to cover her mouth.

Defense counsel immediately objected to the State's argument, explaining that "[t]here is no evidence of that." The State responded that it was closing argument, to which the circuit court reminded the State to confine its argument to the evidence. The State, in the presence of the jury, argued that "*the evidence* supports this theory" of the case, stating, "We have testimony of the scratches on her face…. *Her DNA is found under his fingernails*." (Emphasis added.) The court overruled the objection. The court did not instruct the jury as to whether it could consider the DNA evidence.

¶19 Thomas argues the circuit court erred in allowing the State to use the DNA evidence during its closing argument as substantive evidence rather than its earlier purpose as impeachment evidence of Dr. Williams. While Thomas concedes that "the DNA reports may have initially been brought up in an attempt to impeach the defense expert," the impeachment purpose was no longer present during closing argument, and the court erred in allowing the State to use the DNA results as substantive evidence and his rights under the Confrontation Clause were violated. The issue before us is whether it is proper to use inadmissible testimonial evidence obtained from an expert regardless of whether it is used solely for impeachment of the expert or used by the cross-examiner as substantive evidence of guilt.

¶20 The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see also* WIS. CONST. art. 1,

§ 7.[8] The Confrontation Clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). In *Crawford*, the United States Supreme Court explained that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9. "Therefore, a crucial aspect of the Sixth Amendment right to confrontation, pursuant to *Crawford*, is that it 'only covers hearsay, i.e., out-of-court statements offered in evidence to prove the truth of the matter asserted.'" *State v. Hanson*, 2019 WI 63, ¶19, 387 Wis. 2d 233, 928 N.W.2d 607 (citing *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006)). Whether the right to confrontation is violated is a "question of constitutional law subject to independent review." *State v. Nieves*, 2017 WI 69, ¶15, 376 Wis. 2d 300, 897 N.W.2d 363 (citation omitted).

¶21 Thomas identifies three United States Supreme Court cases addressing the Confrontation Clause that he deems applicable under the circumstances: *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), and *Williams v. Illinois*, 567 U.S. 50 (2012). The State counters that pursuant to *Vinicky v. Midland Mutual Casualty Insurance Co.*, 35 Wis. 2d 246, 151 N.W.2d 77 (1967), the State's use of the DNA evidence was proper under the Confrontation Clause. We will address each case in turn.

---

[8] "We generally apply United States Supreme Court precedent when interpreting these clauses." *State v. Mattox*, 2017 WI 9, ¶20, 373 Wis. 2d 122, 890 N.W.2d 256 (citation omitted).

¶22 In *Melendez-Diaz*, prosecutors introduced three notarized "certificates of analysis" showing test results that the substance tested was cocaine, but no analyst testified as to the contents of the report. *Melendez-Diaz*, 557 U.S. at 308. Applying *Crawford*, the Court held that the certificates were testimonial as they were "quite plainly affidavits" with a clear "evidentiary purpose," which was "to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." *Melendez-Diaz*, 557 U.S. at 310-11 (citation omitted). The Court ruled that the defendant was "entitled to 'be confronted with' the analysts at trial." *Id.* at 311 (citation omitted).

¶23 *Bullcoming*, a drunk driving case, took this holding one step further. There, the prosecutor entered a crime lab report into evidence certifying Bullcoming's blood-alcohol concentration. *Bullcoming*, 564 U.S. at 653. Instead of calling the analysts who certified the lab report results, the prosecution put another analyst on the stand who did not participate in or supervise the work of the certifying analyst, nor did he have an independent opinion as to the results. *Id.* at 660-62. Again, the Court found a Confrontation Clause violation, rejecting such surrogate testimony. *Id.* at 652.

¶24 *Williams* was a rape case. There the Court was called on to determine whether *Crawford* barred "an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify." *Williams*, 567 U.S. at 56. During a bench trial, a witness from the crime lab testified that the DNA profile of the defendant produced by her lab matched the DNA profile found on the vaginal swabs of the victim tested by the outside lab. *Id.* at 61-62. The outside lab's report was not entered into evidence. *Id.* at 62. In a plurality opinion, the Court concluded that this form of expert testimony does not violate the Confrontation Clause: "Out-of-court statements that

are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause."[9] *Id.* at 58-59. The plurality opinion, however, made clear that this case involved a bench trial, not a jury trial. *Id.* at 72. Had the case been presented to a jury, observed the plurality opinion, there would have been a risk of the jury taking the evidence for the truth of the matter asserted, i.e., "that the matching DNA profile was 'found in semen from the vaginal swabs,'" and "[a]bsent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury."[10] *Id.* at 72-73.

___

[9] The plurality opinion explained that this rationale was consistent with *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), as in those cases the forensic reports were introduced for the truth of the matter asserted: that Bullcoming's BAC exceeded the legal limit and that the substance tested in *Melendez-Diaz* was cocaine. *Williams v. Illinois*, 567 U.S. 50, 79 (2012). Instead, in *Williams*, "the report was not to be considered for its truth but only for the 'distinctive and limited purpose' of seeing whether it matched something else." *Id.*

In discussing the dissent's disagreement, the plurality opinion referenced Rule 703 of the Federal Rules of Evidence, explaining that "[u]nder that Rule, 'basis evidence' that is not admissible for its truth may be disclosed even in a jury trial under appropriate circumstances. The purpose for allowing this disclosure is that it may 'assis[t] the jury to evaluate the expert's opinion.'" *Williams*, 567 U.S. at 78 (alteration in original; citation omitted). "The purpose of disclosing the facts on which the expert relied is to allay these fears—to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record—not to prove the truth of the underlying facts." *Id.*

As a second, independent basis for its decision, the plurality opinion also concluded that even if the report had been admitted into evidence, there would have been no Confrontation Clause violation, as the "report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach" and was "produced before any suspect was identified" "for the purpose of finding a rapist who was on the loose." *Id.* at 58.

[10] In a footnote, the plurality opinion explained that "[w]e do not suggest that the Confrontation Clause applies differently depending on the identity of the factfinder. Instead, our point is that the identity of the factfinder makes a big difference in evaluating the likelihood that the factfinder mistakenly based its decision on inadmissible evidence." *Williams*, 567 U.S. at 73 n.4 (citation omitted).

¶25     Justice Thomas concurred with the result, but joined no portion of the plurality's reasoning, calling it a "flawed analysis." *Id.* at 103 (Thomas, J., concurring). Justice Thomas concluded that the lab report was non-testimonial because it "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause" and "there was no plausible reason for the introduction of [the lab report] other than to establish [its] truth." *Id.* at 104 (Thomas, J., concurring). Four justices in the dissent argued that the expert testimony was "functionally identical to the 'surrogate testimony' that New Mexico proffered in *Bullcoming*, which did nothing to cure the problem identified in *Melendez-Diaz* (which, for its part, straightforwardly applied our decision in *Crawford*)." *Williams*, 567 U.S. at 124 (Kagan, J., dissenting).

¶26     Here, Thomas argues that *Melendez-Diaz* and *Bullcoming* control this case as the State "could not have simply introduced the DNA report, even were it in the form of an affidavit or otherwise formally certified, without affording an opportunity to cross-examine the author," *see Melendez-Diaz*, 557 U.S. at 310-11, nor could the State "have introduced the DNA report through a surrogate laboratory technician who had not prepared the DNA report or participated in the DNA testing," *see Bullcoming*, 564 U.S. at 652. The difference between the case before us and *Bullcoming* and *Melendez-Diaz* is as Justice Sotomayor noted in her concurrence in *Bullcoming*: "[T]his is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Bullcoming*, 564 U.S. at 673 (Sotomayor, J., concurring).

14

¶27  What is clear is that an expert's opinion may be based upon inadmissible hearsay.  WIS. STAT. § 907.03 (2019-20).[11]  Section 907.03 is an evidentiary rule that applies in both civil and criminal contexts.  *State v. Watson*, 227 Wis. 2d 167, 200, 595 N.W.2d 403 (1999).  Our case law is also clear that § 907.03 is not a hearsay exception; the facts or data relied on by the expert do not become admissible by virtue of § 907.03.  *Watson*, 227 Wis. 2d at 198-99; *see also* *State v. Weber*, 174 Wis. 2d 98, 107, 496 N.W.2d 762 (Ct. App. 1993) ("Hearsay data upon which the expert's opinion is predicated may not be automatically admitted into evidence by the proponent and used for the truth of the matter asserted unless the data are otherwise admissible under a recognized exception to the hearsay rule.").  The *Watson* court was adamant that § 907.03 "does not permit hearsay evidence to come in through the front door of direct examination," but the court also warned of the "danger" of inadmissible hearsay "reach[ing] the trier of fact through 'the back door' of cross-examination if experts are asked to explain the bases for

---

[11]  WISCONSIN STAT. § 907.03 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.  Facts or data that are otherwise inadmissible may not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion or inference substantially outweighs their prejudicial effect.

Section 907.03 is "substantially similar" to Rule 703 of the Federal Rules of Evidence, which was relied on by the plurality opinion in *Williams*.  *State v. Heine*, 2014 WI App 32, ¶¶10-11, 354 Wis. 2d 1, 844 N.W.2d 409.  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

their opinions," arguing that "[t]hese issues become especially critical in criminal proceedings." *Watson*, 227 Wis. 2d at 199, 201.

¶28 At trial, defense counsel specifically referenced this so-called "back door" evidence in its objection to the State's cross-examination of Dr. Williams. The State counters that the cross-examination was entirely proper under *Vinicky*, which, the State argues, stands for the proposition that hearsay reports may be introduced as admissible evidence by an adverse party for the purpose of impeachment. There, our supreme court explained,

> [W]henever it becomes apparent that a medical expert relies on the reports of other physicians or experts not in evidence, those reports may in their relevant and competent portions be introduced by the adverse party into evidence for the purpose of impeachment and in the interests of verbal completeness.

*Vinicky*, 35 Wis. 2d at 256; *see also* **Karl v. Employers Ins. of Wausau**, 78 Wis. 2d 284, 300, 254 N.W.2d 255 (1977) (applying WIS. STAT. § 907.03 and noting that "*Vinicky* held that facts relied on by the expert may be admitted for the limited purpose of impeachment and verbal clarity. If a party's expert relies on certain data, 'fair play' requires that the opponent may show that the data relied on did not support the conclusions of the testifying expert, or that the data relied on contained information ignored by the testifying expert."); *Weber*, 174 Wis. 2d at 107 n.6.

¶29 The State argues that it cross-examined Dr. Williams regarding the DNA evidence in the crime lab report because it contradicted his findings. Dr. Williams explained that it was important to examine all the facts "in allegations of violence resulting in death where there is evidence of some sort of physical struggle" and to look for an "exchange of evidence." Specifically, Dr. Williams testified that there were no signs of defensive wounds on Thomas, and he also disputed the State's characterization of the wounds on Joyce's face, calling

it an "abrasion" as opposed to what the medical examiner testified were "scratches." According to Dr. Williams, the injuries to Joyce's face were "all minor instances of trauma" and that medical personnel could have injured Joyce's face during resuscitation attempts or Joyce could have received the facial injuries during sex, with her face "down on the floor," as Thomas told police.

¶30 On appeal, the State argues that the fact that Joyce had Thomas's DNA under her fingernails impeaches Dr. Williams' testimony, as it shows "evidence of a struggle." "More damning," it explains, is that Dr. Williams "testified as if there was no evidence that Thomas had [Joyce's] DNA under his fingernails—even though it would explain the scratches on her face, and even though Thomas scratching her face while strangling her is more plausible than her scratching her face on the floor during sex."

¶31 *Vinicky* is the only case that the State cites in direct support of its argument. We recognize, however, that much has happened to Confrontation Clause jurisprudence since *Vinicky* was decided. And as Thomas notes, *Vinicky* is a civil personal injury case, not a criminal case. *See Vinicky*, 35 Wis. 2d at 248. Additionally, the court's conclusion in *Vinicky* was based on the "rationale of … earlier Wisconsin cases," at least one of which discussed the "trustworthiness" of the evidence, *id.* at 255-56, which we know is no longer considered the standard.[12]

---

[12] "The *Crawford* Court overruled the Confrontation Clause test articulated in *Ohio v. Roberts*, 448 U.S. 56 (1980), which had allowed admission of out-of-court statements exhibiting 'adequate indicia of reliability' if the statement either fell 'within a firmly rooted hearsay exception' or bore 'particularized guarantees of trustworthiness.'" *Mattox*, 373 Wis. 2d 122, ¶24 (citations omitted).

Our state courts do not appear to have addressed the survivability of *Vinicky* in the criminal procedure context of *Crawford* and its progeny.

¶32 At least one case in this court has addressed *Crawford* and its progeny in the context of WIS. STAT. §§ 907.03 and 907.05, although the decision did not address *Vinicky* and did not involve the impeachment of an expert witness.[13] In *State v. Heine*, 2014 WI App 32, 354 Wis. 2d 1, 844 N.W.2d 409, the defendant argued that his confrontation rights were violated when a toxicology report— analyzing the blood and urine recovered during the autopsy—was entered into evidence without testimony from the analysts who tested the specimens. The court in *Heine* explained that § 907.03, which is "substantially similar" to Rule 703 of the Federal Rules of Evidence, contains two parts:

> (1) a properly qualified expert witness may rely on inadmissible material if that material is "of a type reasonably relied upon by experts in the particular field in forming

---

[13] Federal courts appear to agree that Rule 703 of the Federal Rules of Evidence has survived under *Crawford* and its progeny, but to what extent and under what circumstances is unclear. *See, e.g.*, *United States v. Ramos-González*, 664 F.3d 1 (1st Cir. 2011) ("Absent further clarification from the Court, the reconciliation of *Crawford*, *Melendez-Diaz*, and *Bullcoming*— which forbid the introduction of testimonial hearsay as evidence in itself—with Rule 703, which permits expert reliance on otherwise inadmissible testimonial hearsay, will necessarily involve a case-by-case assessment as to the quality and quantity of the expert's reliance."); *United States v. McGhee*, 627 F.3d 454, 460 & n.5 (1st Cir. 2010) (collecting cases); *Gardner v. United States*, 999 A.2d 55, 60 n.11 (D.C. 2010) ("[T]he government submitted a large amount of persuasive case law from other jurisdictions which suggests that several federal circuit courts and state courts have ruled that Rule 703 of the Federal Rules of Evidence, and the similar state rules, did indeed survive [after *Crawford*]."). *But see Williams*, 567 U.S. at 132 (Kagan, J., dissenting) ("At bottom, the plurality's not-for-the-truth rationale is a simple abdication to state-law labels…. But we do not typically allow state law to define federal constitutional requirements. And needless to say (or perhaps not), the Confrontation Clause is a constitutional rule like any other. As Justice Thomas observes, even before *Crawford*, we did not allow the Clause's scope to be 'dictated by state or federal evidentiary rules.' Indeed, in [*Tennessee v. Street*, 471 U.S. 409 (1985)], we independently reviewed whether an out-of-court statement was introduced for its truth—the very question at issue in this case. And in *Crawford*, we still more firmly disconnected the Confrontation Clause inquiry from state evidence law, by overruling an approach that looked in part to whether an out-of-court statement fell within a 'firmly rooted hearsay exception.' That decision made clear that the Confrontation Clause's protections are not coterminous with rules of evidence. So the plurality's state-law-first approach would be an about-face." (citations omitted)).

opinions or inferences upon the subject"; and (2) the material may be revealed to the factfinder by the opinion's proponent *only* if "the court determines that their probative value in assisting the jury to evaluate the expert's opinion or inference substantially outweighs their prejudicial effect."

*Heine*, 354 Wis. 2d 1, ¶12. According to *Heine*, an expert is permitted to rely on inadmissible material without violating a defendant's right to confrontation in accordance with the first part of § 907.03. *Heine*, 354 Wis. 2d 1, ¶12. The second part of the rule, in contrast, is meant to "prevent the expert from being a mere conduit for inadmissible material." *Id.*, ¶13. "[T]he disclosure of this otherwise inadmissible information is to assist the jury in evaluating the expert's opinion, *not to prove the substantive truth of the otherwise inadmissible information.*" *Id.*, ¶10 (emphasis added; citation omitted). However, the court observed that pursuant to § 907.05, the adverse party may have the expert witness explain the underlying assumptions and data for his or her opinion. *Heine*, 354 Wis. 2d 1, ¶12 n.5. Importantly, § 907.05 provides that "[t]he expert may testify in terms of opinion or inference and give the reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

¶33 The court in *Heine* ultimately concluded that if an error did occur, it was harmless. Noting that three justices in *Williams* "approved disclosing the data on which the expert relied in order 'to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record,'" we observed that under WIS. STAT. § 907.03 the court must first determine whether the "probative value [of the evidence] in assisting the jury to evaluate the expert's opinion or inference substantially outweighs their prejudicial effect." *Heine*, 354 Wis. 2d 1, ¶14. We explained our rationale as follows:

Assuming without deciding that receipt of the toxicology report into evidence was error under both ***Bullcoming*** and ***Melendez-Diaz***, and that the trial court received the report into evidence in order to explain a foundation for [the expert's] testimony, it did not make the required finding under [§] 907.03, we agree with the State that the errors, if they were errors, were harmless beyond a reasonable doubt because under [§] 907.03, [the expert's] testimony that he regularly relied on toxicology results in forming his final opinion as to cause of death laid the proper foundation for him to have relied on the toxicology report irrespective of whether that report was admissible into evidence or disclosed to the jury.

***Heine***, 354 Wis. 2d 1, ¶14.

¶34      In this case, the crime lab report is testimonial like the reports in ***Melendez-Diaz*** and ***Bullcoming***, as it was prepared at a point when Thomas was a suspect in the crime and meant to serve as evidence in a potential criminal trial. *See* ***Melendez-Diaz***, 557 U.S. at 310-11, 323; ***Bullcoming***, 564 U.S. at 664-65; ***Mattox***, 373 Wis. 2d 122, ¶¶37-38.   We acknowledge that Confrontation Clause jurisprudence is nuanced and remains unresolved, but we also note that the plurality opinion's focus in ***Williams*** was on the fact that the case involved a bench trial and not a jury trial, which was important "in evaluating the likelihood that the factfinder mistakenly based its decision on inadmissible evidence." ***Williams***, 567 U.S. at 73 n.4.   This observation goes hand in hand with our supreme court's concern in ***Watson*** (and implicitly by ***Heine***, 354 Wis. 2d 1, ¶14) that WIS. STAT. § 907.03 may not be used to allow inadmissible hearsay through the "back door" of cross-examination, especially in criminal proceedings. ***Watson***, 227 Wis. 2d at 199, 201; *see also* ***Williams***, 567 U.S. at 132-33 (Kagan, J., dissenting) (noting that the plurality opinion's "approach would allow prosecutors to do through subterfuge and indirection what we previously have held the Confrontation clause prohibits" and that "[i]f the Confrontation Clause prevents the State from getting its evidence in through the front door, then the State could sneak it in through the back.  What a

neat trick—but really, what a way to run a criminal justice system. No wonder five Justices reject it."). Importantly, the circuit court in this case did not employ any limiting jury instructions to protect against the jury using the DNA evidence against Thomas for an improper purpose.[14] Nor did the circuit court, pursuant to § 907.03, make any findings necessary to reveal the DNA evidence to the factfinder. We also conclude that the State's reference to the DNA evidence during closing arguments ("*[T]he evidence* supports this theory …. *Her DNA is found under his fingernails.*") was a shift from a non-hearsay impeachment purpose to a substantive use to prove the truth of the matter asserted (that scratches on her face came from Thomas). (Emphasis added.) While the State's closing argument/comments are not

---

[14] Our supreme court quoted law professor Daniel Blinka for his discussion of "the practical difficulty of explaining the bases for expert opinions when they include inadmissible evidence, and the unsatisfactory options for resolving the question":

> Problems arise, however, when experts are called upon to explain how they reached a conclusion. What should be done with the experts' inadmissible bases? Does the experts' reliance validate the otherwise inadmissible information, thereby transforming it into admissible evidence? Conversely, should the court bar any mention of the tainted bases while permitting only the expert's testimony about the opinion? Or should the judge instruct the jury to consider the inadmissible bases for whatever bearing they have on the cogency of the expert's opinion testimony, but not for any other purpose? If the judge elects the latter course, what exactly does such an instruction mean? And if such limiting instructions are meaningless, is Rule 703 [a federal evidence rule parallel to WIS. STAT. § 907.03] a device that allows a party to simply parade inadmissible evidence before the jury in direct contravention of the exclusionary rules?

*State v. Fischer*, 2010 WI 6, ¶21, 322 Wis. 2d 265, 778 N.W.2d 629 (alteration in original) (quoting Daniel D. Blinka, *"Practical Inconvenience" or Conceptual Confusion: The Common-Law Genesis of Federal Rule of Evidence 703*, 20 AM. J. TRIAL ADVOC. 467, 469 (1997)); *see also Williams*, 567 U.S. at 72 (suggesting that had the case been tried to a jury, "the testimony could not have gone to the jury" "[a]bsent an evaluation of the risk of juror confusion and careful jury instructions").

considered evidence we note that the State, in the presence of the jury, stated that the DNA was "evidence" and it supported the State's theory that Thomas was scratching her face and trying to cover her mouth. The circuit court denied Thomas' objection during the cross-examination of Dr. Williams by the State and his objection in closing argument and did not instruct the jury at either time on how the jury could consider the inadmissible DNA evidence (solely as impeachment evidence).

¶35    The DNA evidence was inadmissible hearsay and it was erroneously received during trial and closing argument as no limiting instructions were given to the jury as to its consideration of the DNA evidence. Pursuant to *Melendez-Diaz*, *Bullcoming*, *Williams*, *Watson* and *Heine*, the DNA evidence, at a minimum, could not be presented to the jury without proper limiting instructions and could not be used by the State as substantive evidence.[15]

---

[15] We disagree with the premise of the Concurrence. The parties have preserved, presented, and argued the question of whether a Confrontation Clause violation occurred, and we owe it to the parties to answer that question. Under the circumstances presented, to decide this case on harmless error without describing how the court erred leaves both the bench and bar guessing as to what the error was. If we are wrong on the Confrontation Clause analysis, then our supreme court will address this difficult, evolving, and nuanced issue and we will all be the better for it.

¶36    Our inquiry does not end with our finding of a Confrontation Clause violation as "[a] Confrontation Clause violation does not result in automatic reversal, but is subject to harmless error analysis." *State v. Deadwiller*, 2013 WI 75, ¶41, 350 Wis. 2d 138, 834 N.W.2d 362.  The party benefitting from the error has the burden to prove that "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* (citation omitted). Meaning that the error is harmless if "the error complained of did not contribute to the verdict obtained" and "the jury *would* have arrived at the same verdict had the error not occurred." *Id.* (citation omitted).  As our supreme court in *Deadwiller* explained,

> Several factors guide our analysis:  "the frequency of the error; the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; whether the erroneously admitted evidence duplicates untainted evidence; the nature of the defense; the nature of the State's case; and the overall strength of the State's case."

---

The Concurrence also says we are "miss[ing] the mark" in our analysis by applying United States Supreme Court authority addressing this issue in the context of direct examination of experts who opined as to forensic reports they did not prepare. Concurrence, ¶50.  The Concurrence claims that the analysis is "*entirely different*" where the State seeks to submit the same evidence through the backdoor on cross-examination of a defense expert. Concurrence, ¶53.  Nothing in Confrontation Clause jurisprudence suggests such a distinction, and the authority cited by the Concurrence largely consists of pre-*Crawford* hearsay cases.  We cannot accept that the much more recent United States Supreme Court precedent on this constitutional question is limited to situations involving "direct examination" in the absence of some indication that it was so intended.  Nor can we accept the notion that the defense "opened the door" to use of the report by merely calling an expert on the general issue of cause of death—again, even the broadest view of whether and when a party "opens the door" to allowing in testimonial evidence without a testifying witness would not have applied that doctrine here.  To be clear, nothing would have precluded the State from asking Dr. Williams hypothetical questions grounded in a forensic report concerning his opinion, but if the State wished to then have those hypotheticals treated as evidence, the Confrontation Clause requires that the report be authenticated and introduced through its preparer so that he or she can be subject to cross-examination.

*Id.* (citation omitted).

¶37    We agree with the State that if the DNA evidence was erroneously admitted, the error was harmless, as a jury would have found Thomas guilty even without the DNA evidence.  As a jumping off point, the DNA evidence was not the cornerstone of the State's case; intent was the question before the jury.  Whether DNA evidence was or was not found on Joyce or Thomas was almost immaterial, as the identity of the perpetrator was not at issue.  In terms of the remaining factors, the discussion of the DNA evidence occurred, from what we can tell, only two times, each time involving a very short discussion.  The DNA evidence also establishes little about the intentional aspect of the crime, and Dr. Williams provided a plausible explanation in support of Thomas's defense for the existence of the evidence, noting that the parties lived together and could have scratched each others backs at some point.

¶38    The evidence of Joyce's injuries, testified to by the medical examiner,[16] including that she bit her tongue and swallowed blood as a result, supports the State's theory even without DNA evidence.  The State could still have argued in its closing that Thomas covered Joyce's mouth with his hand while he was strangling her, as the evidence from the expert opinion of the medical examiner was that Joyce received "the scratches or the abrasions on the face, on the nose, [and] underneath the nose" "at or around the time of death."

---

[16] The medical examiner testified that Joyce had "injuries to her face and her neck consistent with strangulation," including "hemorrhage or bruising underneath the skin" of her neck; "bruising of the tongue" that may have been caused "by a force against the neck pushing the back of the neck into the spine"; "bites to the tongue"; "injuries to the inner surface of the lips"; "bloody fluid in [her] stomach" from blood that Joyce swallowed that "could have" come from the tongue bite or the lip injuries; and "scratches on [Joyce's] face."

¶39 Likewise, Thomas's own words provide strong support for the State's case that he intentionally caused Joyce's death. For example, he stated that he "kept squeezing [Joyce's neck] for a little while" during which time "Joyce was struggling," "telling [him] to stop," "kicking the floor," and "telling me she loved me." According to Thomas, "[a]fter [he] turned [Joyce] loose, Joyce was breathing funny," yet he "left" and went for a walk. Only after he returned from his walk—well after the time that Joyce could have been helped—he called 911. Therefore, even if Thomas's right to confrontation was violated, that error was harmless beyond a reasonable doubt.

*Juror Bias*

¶40 Finally, Thomas argues that the circuit court erred by failing to strike an objectively biased juror. During voir dire, the State read a list of witnesses, including Erika and Victor Cruz,[17] that it planned to call to testify. The court inquired of the prospective jurors, whether anyone was "acquainted with any of the persons" on that list. One prospective juror, Zina Cruz Vargas, raised her hand and indicated that she thought she was related to the Cruzes, stating, "I'm pretty sure we are cousins." When questioned by the court, however, Zina responded that she did not socialize with the Cruzes and that it would not affect her judgment in this case. Neither the State nor Thomas moved to strike Zina, and she sat on the jury.

¶41 A defendant is guaranteed the right to an unbiased jury under both the United States and Wisconsin Constitutions. U.S. CONST. amend. VI; WIS. CONST. art. I, § 7; *State v. Brunette*, 220 Wis. 2d 431, 439, 583 N.W.2d 174 (Ct.

---

[17] Victor Cruz did not testify at the trial. As previously discussed, Cruz's testimony concerned what she heard and saw the evening Joyce died from her vantage point in the apartment immediately below the Thomases' apartment. *See supra* ¶9.

25

App. 1998); *see also* WIS. STAT. § 805.08(1). This state recognizes three classifications of juror bias: statutory, subjective, and objective. *State v. Faucher*, 227 Wis. 2d 700, 716, 596 N.W.2d 770 (1999). On appeal, Thomas concedes that Zina was not statutorily or subjectively biased, but he submits that she was objectively biased based on her alleged relationship to the State's witness. Our supreme court explained that "the focus of the inquiry into 'objective bias' is not upon the individual prospective juror's state of mind, but rather upon whether the reasonable person in the individual prospective juror's position could be impartial." *Id.* at 718. To assess objective bias, the court "must consider the facts and circumstances surrounding the *voir dire* and the facts involved in the case," but the emphasis "remains on the reasonable person in light of those facts and circumstances." *Id.* at 718-19. We review whether a juror is objectively biased as a mixed question of fact and law. *Id.* at 720. We will uphold the circuit court's findings regarding the facts and circumstances unless clearly erroneous, but we review whether those facts fulfill the legal standard for objective bias de novo. *Id.*

¶42 As an initial matter, the State argues that Thomas is not entitled to a review of his juror bias claim because he was required to raise it as an ineffective assistance of counsel claim and he failed to do so. Thomas does not refute the State's argument in his reply brief and, therefore, concedes this issue. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (noting that failure to refute an argument constitutes a concession).

¶43 A defendant must timely present a claim of juror bias to the circuit court; failure to do so results in forfeiture of the claim. *See Brunette*, 220 Wis. 2d

at 442.[18] Thomas does not assert on appeal that he objected to the juror during voir dire; thus, he has forfeited this issue. We may, however, review a juror-bias claim if the defendant presents the issue from an ineffective assistance of counsel posture. *Id.* at 445. A defendant must preserve an ineffective assistance of counsel claim in a postconviction motion. *State ex rel. Rothering v. McCaughtry*, 205 Wis. 2d 675, 681, 556 N.W.2d 136 (Ct. App. 1996). Thomas, however, failed to raise the issue as an ineffective assistance of counsel claim in his postconviction motion before the circuit court. Therefore, as Thomas did not preserve the ineffective assistance claim at the circuit court, he forfeited it.

¶44 In the interest of finality, we note that even if Thomas had not forfeited his claim on appeal, it fails. Thomas cites to *State v. Gesch*, 167 Wis. 2d 660, 663, 665, 482 N.W.2d 99 (1992), where one of the prospective jurors was the brother of the police officer who would be testifying for the state. Defense counsel moved to have the juror removed for cause, and the circuit court refused. *Id.* at 664. Although the prospective juror indicated that he "would remain impartial and would not give additional weight to his brother's testimony," our supreme court concluded that a reasonable person would have a difficult time "remain[ing] unaffected by the testimony of a relative by blood or marriage to the third degree." *Id.* at 663, 667-68. In its determination that the juror was objectively biased, the court emphasized the significance of the officer's testimony. *Id.* at 668-69.

---

[18] We note that in *State v. Brunette*, 220 Wis. 2d 431, 445, 583 N.W.2d 174 (Ct. App. 1998), the court refers to the failure to move to strike a potential juror as a "waiver of the defendant's right to object to that person sitting on the jury." Since *Brunette* was decided, our supreme court has clarified, in *State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612, that the terms "waiver" and "forfeiture" are distinct, despite cases referring to them interchangeably. Although *Brunette* used the word "waiver," forfeiture is appropriate in this context.

¶45 The circuit court did not err in failing to excuse Zina for objective bias. Thomas suggests that the alleged family relationship between Cruz and Zina is, like the juror in *Gesch*, a "situation[] in which the relationship between a prospective juror and a participant in the trial is so close that a finding of [objective] bias is mandated." *Id.* at 666-67. As an initial matter, we note that Thomas does not submit on appeal that the two women are in fact related. Second, we agree with the State's contention that *Gesch* discussed a "relative by blood or marriage to the third degree," which refers to the degrees of kinship now found in WIS. STAT. § 990.001(16).[19] On that chart, cousins are at most a fourth degree relative. *See* § 990.001(16). Thus, even if Cruz and Zina are cousins, that does not mandate a finding of objective bias under *Gesch*.

¶46 And third, unlike the brothers in *Gesch*, who had a close relationship, Zina could not say for certain that she was related to the Cruzes. She observed only that the names were "familiar" to her, and even if they were related, Zina stated that she did not socialize with them. *See State v. Oswald*, 2000 WI App 3, ¶8, 232 Wis. 2d 103, 606 N.W.2d 238 ("[E]xclusion of a juror for objective bias requires a direct, critical, personal connection between the individual juror and crucial evidence or a dispositive issue in the case to be tried or the juror's intractable negative attitude toward the justice system in general."). Accordingly, we cannot say that a reasonable person in Zina's position could not set aside her opinion or knowledge and be impartial. *See Faucher*, 227 Wis. 2d at 718-19.

*By the Court.*—Judgment and order affirmed.

---

[19] The court in *State v. Gesch*, 167 Wis. 2d 660, 671, 482 N.W.2d 99 (1992), referenced WIS. STAT. § 852.03(2) (1989-1990), which is the same as the chart under WIS. STAT. § 990.001(16).

No. 2020AP32-CR(C)

¶47 NEUBAUER, C.J. (concurring). I concur in the Majority's analysis and conclusions that neither the "corroboration rule" nor Thomas's right to a fair and impartial jury was violated. I also agree that Thomas's assertion that his confrontation rights were violated fails on the ground that any alleged error was harmless beyond a reasonable doubt, for all of the reasons set forth in the Majority.

¶48 I do not join in the analysis considering whether Thomas's Confrontation Clause[1] rights were violated when the circuit court permitted cross-examination of Thomas's expert (and subsequent closing argument by the State) regarding an underlying report setting forth hearsay (testimonial DNA test results) that the expert reviewed in rendering his opinion. Majority, ¶¶20-35.

¶49 We should decide cases on the narrowest grounds, which is particularly applicable here given our agreement that any violation is harmless. Adding to the extensive legal literature in an area the Majority acknowledges is changing and "unresolved," as the United States Supreme Court has provided fractured decisions setting forth different analytical foundations, is not helpful to the bench and bar. We should not plow new ground when wholly unnecessary, as the law is best developed gradually and, in any event, only when the parties have adequately developed the facts and law. That is not the case here.

---

[1] The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. CONST. amend. VI; see also WIS. CONST. art. 1, § 7. "We generally apply United States Supreme Court precedent when interpreting these clauses." *State v. Mattox*, 2017 WI 9, ¶20, 373 Wis. 2d 122, 890 N.W.2d 256 (citation omitted).

¶50     The Majority concludes that "[t]he DNA evidence was inadmissible hearsay and it was erroneously received during trial and closing argument as no limiting instructions were given to the jury as to its consideration of the DNA evidence."    Majority, ¶35.    The Majority's analysis misses the mark, as it acknowledges but then fails to address Thomas's constitutional challenge based on the fact that the disclosure was made via Thomas's expert whose opinion was impeached through cross-examination, rather than through direct examination of the prosecution's expert.    While not necessarily dispositive, the Majority's opinion makes clear that the Confrontation Clause analysis does begin with the rules of evidence.    And, as explained below, as an evidentiary matter, the report was admissible on cross-examination and for impeachment.

¶51     The underlying report was reviewed by Thomas's expert, Dr. Williams, who testified "that there is insufficient evidence to establish that this is an intentional strangulation."    Williams explained that it was important to examine all the facts "in allegations of violence resulting in death" and to look for an "exchange of evidence" between the individuals where there is "evidence of some sort of a physical struggle."    He testified that he saw no defensive wounds on Thomas, and he disputed the characterization of the wounds to the victim's face as "scratches."    He testified that the abrasions could have been caused by emergency medical personnel during resuscitation attempts or by contact with the floor while facedown during sex.

¶52 The State sought to impeach Williams by showing that he inappropriately discounted the lab report's DNA evidence.[2] Although not introduced into evidence, it is undisputed the report shows that Thomas's DNA was found under Joyce's fingernail clippings and her DNA was found under his. As the Majority explains in more detail, both the State and Thomas offered different interpretations of this information. The State contended it supports a conclusion that Joyce was struggling when Thomas had his arm around her neck, and that Thomas scratched Joyce's face while trying to silence her. Thomas's explanation, as indicated above and on cross-examination of Williams, was that the DNA evidence was insignificant, benign, and inconclusive.

¶53 Again, while acknowledging that the impeachment of the expert was permissible, the Majority proceeds to analyze the evidentiary and Confrontation Clause implications, including policy concerns, under the analysis applicable to direct examination of a prosecutor's expert. Majority, ¶¶21-35.[3] The evidentiary

---

[2] Cross-examination of an expert with inadmissible hearsay is permissible for purposes of impeachment "once the witness concedes having 'reviewed' the particular report or statement prior to testifying. The witness may not agree with the contents, but he may be cross-examined about them and even compelled to concede[] that the hearsay undercuts his opinion." 7 DANIEL D. BLINKA, WISCONSIN PRACTICE SERIES: WISCONSIN EVIDENCE § 702.6042, at 726-27 (4th ed. 2017) (citing *Karl v. Employers Ins. of Wausau*, 78 Wis. 2d 284, 300, 254 N.W.2d 255 (1977)). Cross-examination/impeachment may also be available even if the expert did not review the report when the adverse party seeks to show that the expert should have taken the overlooked information into account. *Id.*

[3] The Majority relies on cases involving direct examination of the prosecutor's expert, concluding that under "*Melendez-Diaz*, *Bullcoming*, *Williams*, *Watson* and *Heine*, the DNA evidence, at a minimum, could not be presented to the jury without proper limiting instructions and could not be used by the State as substantive evidence." Majority, ¶35.

analytical framework, however, is *entirely different* when it comes to impeachment through cross-examination by the adverse party.[4]

¶54     As the Majority appropriately discusses, the evidentiary question presented with direct examination of the prosecution's expert witness who considered inadmissible but permissible underlying hearsay (for example, when it is of the type reasonably relied upon by such experts), is how much information about the basis should be disclosed to the jury—full, partial, or none. *See* 7 DANIEL D. BLINKA, WISCONSIN PRACTICE SERIES: WISCONSIN EVIDENCE § 702.6042, at 707-11 (4th ed. 2017). It is under these circumstances that courts express concern about permitting a prosecutor, the proponent, to use the expert as a conduit for otherwise inadmissible evidence. *See* ***State v. Coogan***, 154 Wis. 2d 387, 399, 453 N.W.2d 186 (Ct. App. 1990).

¶55     "The disclosure issue[, however,] is confined to direct examination; the cross-examiner is given virtually free rein to inquire into an expert's underlying bases by [WIS. STAT.] § 907.05 regardless of admissibility issues." BLINKA, *supra*, at 710-11, 725-26; *see* § 907.05 (an expert may "be required to disclose the underlying facts or data on cross-examination"); *see also* Fed. R. Evid. 703 advisory committee's note to 2000 Amendment ("Nothing in this Rule restricts the presentation of underlying expert facts or data when offered by an adverse party."); ***Karl v. Employers Ins. of Wausau***, 78 Wis. 2d 284, 299-300, 254 N.W.2d 255 (1977) (while the trial court may limit the proponent's latitude in disclosing the inadmissible bases to the jury, the inadmissible hearsay may be elicited on cross-

---

[4] The Majority asserts that "[n]othing in Confrontation Clause jurisprudence suggests … a distinction" between evidence presented through direct examination versus cross-examination. Majority, ¶35 n.15. This fails to acknowledge that the evidentiary framework informs the Confrontation Clause jurisprudence.

examination by the opponent for impeachment and is admissible); ***Vinicky v. Midland Mut. Cas. Ins. Co.***, 35 Wis. 2d 246, 255, 151 N.W. 2d 77 (1967); ***State v. Weber***, 174 Wis. 2d 98, 106-07 n.6, 496 N.W.2d 762 (Ct. App. 1993); ***Liles v. Employers Mut. Ins. of Wausau***, 126 Wis. 2d 492, 505, 377 N.W.2d 214 (Ct. App. 1985).

¶56     The analysis is the same in criminal cases. *See **Coogan***, 154 Wis. 2d at 400 (the underlying factual basis for the defendant's experts' opinions are not admissible, "unless the state opens the door by cross-examining the experts on the unreliability of the facts underlying their opinion").

¶57     Thus, the Majority errs by importing and relying upon the disclosure distinctions courts have struggled to employ when considering the prosecution expert's consideration of testimonial hearsay on direct examination.    The conundrum courts face under those circumstances often involves a requested limiting jury instruction when there is partial or full disclosure with guidance as to how the jury is to consider the testimonial hearsay—for example, for the truth of the matter asserted or simply to weigh or evaluate the expert's testimony. *See **State v. Watson***, 227 Wis. 2d 167, 200, 595 N.W.2d 403 (1999) (a limiting instruction must

be given upon request of opposing counsel); BLINKA, *supra*, at 725.[5]

¶58 But none of the disclosure issues are presented with impeachment through cross-examination. Presumably, that is why Thomas did not request a jury instruction.[6] As an evidentiary matter, the underlying facts may be admitted into evidence. *Karl*, 78 Wis. 2d at 299-300 (rejecting argument that the underlying report could not be admitted into evidence or considered as substantive evidence); *Vinicky*, 35 Wis. 2d at 255; *Coogan*, 154 Wis. 2d at 400. *Karl*, *Vinicky*, *Coogan*, and WIS. STAT. § 907.05 permit admission of the underlying hearsay report by the party adverse to the witness.

¶59 Tellingly, the Majority does not identify a single case involving *cross-examination* in support of its attempt to distinguish between permissible reference to the report's findings for "non-hearsay impeachment purposes" as compared to impermissible "substantive use to prove the truth of the matter asserted." Nor does it identify a single case requiring a jury instruction limiting the jury's consideration

---

[5] Commenting that in the context of disclosing underlying inadmissible hearsay in direct examination:

> [T]he expert may have relied upon the hearsay statement for the truth of the matter asserted, yet the jury is instructed it cannot use the statement for the very same purpose. Rather, the jury is told to use it to evaluate and weigh the expert's testimony not for its truth, a distinction that is nonsensical and incomprehensible because that is exactly how the expert used it!

*See* BLINKA, *supra*, at 722.

[6] The Majority faults the circuit court for failing to provide a jury instruction without identifying a request from the defendant. Majority, ¶35. Aside from the inapplicability here, the defendant's failure to do so constitutes waiver. Failure to object at the jury instruction or verdict conference stage "constitutes a waiver of any error in the proposed instructions or verdict." WIS. STAT. § 805.13(3); *State v. Trammell*, 2019 WI 59, ¶19, 387 Wis. 2d 156, 928 N.W.2d 564. Notably, the defendant makes no argument based on the absence of a limiting jury instruction.

of the report, which *can* be admitted into evidence upon cross-examination and impeachment. Perhaps even more relevant here, Williams was Thomas's expert. The Majority fails to identify legal support for its analysis when it is the defendant's expert who reviewed, and thus, opened the door to admission of, the evidence through cross-examination and impeachment by the adverse party.

¶60 While the evidentiary analysis is not necessarily dispositive, it is clearly the starting point for review of a Confrontation Clause challenge. In that regard, again, the Majority's analysis wholly ignores that this was Thomas's expert, and by presenting the same, he arguably opened the door.[7] He, not the State, presented an expert who reviewed and opined about what the physical evidence showed, and whether it supported the State's version of the death (intentional), or Thomas's version (unintentional).

¶61 Courts across the country have considered whether, and under what circumstances, a criminal defendant who opens the door forfeits his or her right to exclude evidence otherwise barred by the Confrontation Clause. In fact, the United States Supreme Court has agreed to consider this issue. *People v. Hemphill*, 150 N.E.3d 356 (N.Y. Ct. App. 2020), *cert granted sub nom. Hemphill v. New York*, No. 20-637, 2021 WL 1520786 (Apr. 19, 2021). According to the certiorari petition, three jurisdictions hold that criminal defendants never open the door to the admission of evidence that is otherwise barred by the Confrontation Clause, while five jurisdictions hold that defendants open the door to testimonial hearsay when the defendant introduces a testimonial statement by the same declarant, and three jurisdictions hold that defendants open the door to testimonial hearsay whenever

---

[7] Without citing to any case law or other legal authority, and without explanation, the Majority claims that "even [under] the broadest view," Thomas could not have opened the door to the admission of the DNA evidence here. Majority, ¶35 n.15.

7

they create a misleading impression at trial. *Hemphill v. New York*, No. 20-637, 2020 WL 6595110, \*10 (Nov. 6, 2020).

¶62    While the facts and circumstances vary widely, there is a common denominator—whether a criminal defendant who opens the door forfeits his or her right to exclude evidence otherwise barred by the Confrontation Clause.  Here, Thomas opened the door to the very same testimonial hearsay he now challenges, the DNA lab report, when he offered Williams's opinion as to whether or not Joyce's death was intentional, and reviewed the report in the process.

¶63    Arguably, Thomas would have been permitted to affirmatively provide a misleading impression had the State been precluded from addressing a report Thomas's expert reviewed in coming to his opinion.  So, the question is before us:  Was Thomas's confrontation right violated when he opened the door to cross-examination of the expert about the findings of the DNA report, and consequently, argument by the State in its closing as to the import of the report? Because the Majority's analysis fails to address the facts before us, I do not join in the constitutional Confrontation Clause analysis, but concur as set forth above, as any violation was harmless.